Alright, good morning again everyone. The second case for argument this morning is McHenry and Kankakee Counties against Attorney General Raoul. We'll hear first from Ms. Dixon. Good morning. May it please the court. My name is Jana Blake Dixon and I'm an Assistant States Attorney in McHenry County. I represent the appellants McHenry and Kankakee Counties in the state of Illinois. The central issue of this case lies with the complex interplay between local, state, and federal government and the sometimes competing interests amongst those layers of government as they create law. In this case, those competing interests can be summarized thusly. The federal government has a need for adequate detention facilities for immigrants. For the past decade, McHenry and Kankakee Counties have met that need for the federal government by providing immigration detention for profit in those counties. In 2021, at the behest of different political factions both in and outside of McHenry County, the McHenry County Board spent months debating whether or not the county's contract with ICE should continue. And ultimately, the County Board determined that the benefits of the contract to the residents of the county outweighed any costs associated with it. However, in late 2021, the state of Illinois disagreed and tied the hands of the McHenry County Board by passing the Illinois Way Forward Act, which required the cancellation of any county contracts with the federal government for immigration detention in the state of Illinois by January 1, 2021. In the absence of the Ninth Circuit's decision in GEO Group, which has been vacated for re-hearing on Bonk, this is an issue of, this is a case of first impression for all of the United States Courts of Appeal. And I wanted to begin just briefly with the basis of the petition for re-hearing in GEO Group. In GEO Group, originally the Ninth Circuit panel had determined that a similar California law, AB 32, which outlawed private detention facilities in California, was preempted and violated the principle of intergovernmental immunity. Now importantly, in California, the federal government contracts with only private detention facilities for immigration detention. That is different from Illinois, where the federal government contracts pursuant to federal statute section 1103, which allows specifically for these cooperative agreements with state or political subdivisions thereof for these cooperative agreements. In their petition for re-hearing, the state of California objected to the Ninth Circuit's decision on two bases. One involved the preemption claim. California disagreed with the Ninth Circuit's refusal to apply what is called the presumption against preemption. And however, the state of California acknowledged that the presumption against preemption would not apply in a scenario where there was a contract with a state or local government because those types of agreements are specifically contemplated by Congress. Additionally, the state of California objected to the intergovernmental immunity argument that the Ninth Circuit had accepted. There is a difference between the intergovernmental immunity argument that the counties make in the present case and the one that prevailed in the Ninth Circuit. There are really two forms of intergovernmental immunity. One which seeks to directly regulate the federal government through regulation of the federal government or its contractors and intergovernmental immunity violations which are based on discrimination of the federal government or its federal contractors. Here, the counties argue that the intergovernmental immunity violation that is occurring is the fact that the Illinois Way Forward Act seeks to directly regulate the federal government, which it does. These contracts only affect the counties who have contracts with the federal government. Well, presumably the law applies to every county in Illinois, right? The law applies to every county in Illinois, but at the time of the Illinois Way Forward Act, there were three counties in Illinois who had these cooperative agreements, Pulaski, Kankakee, McHenry County. Pulaski County had already decided to terminate their contract with the federal government because they found it to not be profitable anymore. So really, the law which required the cancellation of existing contracts only applies to McHenry and Kankakee counties. And again, it also only applies to the federal government because the federal government exclusively occupies the field of immigration detention. Ms. Dixon, could you talk about the anti-commandeering principle? Yes. And the way it works into these considerations. Sure. So the state relies heavily on the Tenth Amendment and the anti-commandeering principle, which the counties agree with the fact that the federal government cannot force a state to participate in these types of agreements. However, the state simply says, well, the political subdivisions of the counties are political subdivisions of the state, and therefore they are one. And in many circumstances, that is accurate. A political subdivision is sort of intertwined with the state. The Supreme Court cases that talk about political subdivisions suing the state refers to the term creator state. And there is, I think, a real heavy leaning against allowing political subdivisions to sue creator states because political subdivisions are there to serve the creator state. However, in this very specific instance, I don't think that the Tenth Amendment anti-commandeering principles apply here because as a political subdivision of the state of Illinois, the McHenry and Kankakee counties have a right under the Illinois Constitution, which allows them to cooperate with the federal government. Did I? Excuse me? Did you make an Illinois constitutional argument? In your brief? I, in our response to, in our reply to the APLE brief, we do outline this argument. And I understand that the argument is somewhat convoluted, so I will do the best that I can to explain it. The Illinois Constitution allows what it calls units of local government, political subdivisions, to engage in intergovernmental agreements or cooperation, including intergovernmental cooperation with the federal government. Are you, well, wait a minute, are you asking us to enforce the Illinois Constitution here? I am pointing out that the political, our power, the county's power to contract with the federal government is derived from the Illinois Constitution, not from the Illinois legislature. In this particular instance. So you think the law violates the Illinois Constitution? I think that the law violates the United States Constitution because it's preempted and it violates the Supremacy Clause under the Intergovernmental Community. I know, but you run into a lot of trouble on those arguments. I understand. I think that because those, because that law, because the Illinois Way Forward Act is an unconstitutional law, that the Illinois legislature cannot use an unconstitutional law to circumvent the power that is given to the counties through the Illinois Constitution. Excuse me, but that sounds very circular to me. I understand. Okay. But you understand, we have no business telling Illinois that it has passed a law that violates the Illinois Constitution. That it takes away from the counties a power that you say, at least somehow in your reply brief for the first time, that counties have notwithstanding contrary legislation. You do have the power to tell Illinois that the law that they passed violates the United States Constitution. We know that very well, counsel, but this seems like a kind of, I was going to say a circular bank shot, but that gets confusing if you're relying on the Illinois Constitution. I, in the state's opinion, the county's only ability to contract is derived from the state's legislative power. My argument is that that power is derived from the Constitution, the Illinois Constitution, and that the state is unable to circumvent that Illinois constitutional power via an unconstitutional, federally unconstitutional law. Can you give us a status, Ms. Dixon, as to each of the two counties that had the contracts, whether or not there are any non-citizens present in facilities in those counties now? Both of the counties, as a result of the counties that applied for a stay with this court, that stay was denied. Both of the counties complied with the Illinois Way Forward Act and canceled their contract with the federal government. And it's my understanding that the federal government has moved all of their immigration detainees out of those jails. There may be pretrial detainees in the jails that are there on state criminal charges, but we are no longer, McHenry and Kankakee counties are no longer receiving any remuneration under that cooperative services agreement. Do you see any mootness issues, or is it the intent of the county to potentially have such an agreement in the future? I believe, again, in 2021, McHenry County extensively debated whether or not this contract was a benefit to the county. It determined that it was. If this law, the Illinois Way Forward Act, were to be overturned and the opportunity presented itself, I believe that the McHenry County Board would seriously reconsider having ICE detainees back in the jail. Thank you. Sorry, could you direct me in your reply brief to this Illinois constitutional point? I do believe that it's in the final section under intergovernmental immunity. The state relies heavily, again, in the intergovernmental immunity section on the argument, the anti-commandeering argument, so I believe it's in that section. Local governments may do this in any manner, not prohibited by law or by ordinance. Yes. That's the way that ends up. Exactly. And this sounds prohibited by law. Exactly. The law is attempting to prohibit the cooperation. I would argue that that law, because it is unconstitutional, it's a violation of the supremacy clause, both in the basis of preemption and intergovernmental immunity, that they cannot use, the state cannot use, an unconstitutional law to do something that they should not be able to do. I do want to take just briefly a minute to go over our preemption arguments. This is a field that is exclusively occupied by the federal government. There is no involvement in the state with immigration detention. Any of the cases that have actually gone to the Supreme Court regarding immigration as a subarea have ultimately erred on the side of many of the immigration functions being occupied by the federal government. Additionally, I understand that there are issues with Murphy, so I want to move on to the intergovernmental immunity argument, which doesn't have any requirement on private actors or public actors. This is a direct regulation of the federal government via regulation of its contractors. In the state's brief, they talk about how, well, worst case scenario, it just makes it more expensive for the federal government. Making it more expensive is a direct regulation of the federal government. The fact that they understand that they cannot prevent the federal government from constructing facilities, I think alone shows that they know that they cannot regulate the federal government and that this is an area where the federal government occupies the field completely. And if you have no further questions, I'd like to reserve the remainder of my time. Thank you, Ms. Dixon. For the state, for the Attorney General, Mr. Hemmer. Good morning. Alex Hemmer for the Illinois Attorney General. The district court's decision should be affirmed. The 10th Amendment entitles states to decide whether to assist the federal government in implementing federal law. And Section 15G reflects only Illinois' decision not to help enforce certain provisions of federal immigration law. That basic principle resolves both of plaintiffs' claims because accepting either claim would require Illinois, via its subdivisions, to continue to participate in a federal program it has decided to withdraw from. That result cannot be squared with the 10th Amendment. Unless the court has a contrary preference, I'll talk about each claim individually, starting with the preemption claim. The most straightforward way to reject plaintiffs' preemption claim is simply to read the text of the statutes that plaintiffs say preempt Section 15G. Any good faith reading of those provisions makes clear that they have no preemptive effect. Plaintiffs rely mainly on two sections of Title VIII. The first, Section 1231G, directs the Attorney General to, quote, consider the availability for purchase or lease of an existing prison, jail, or detention center before constructing a federal detention center. The second, Section 1103A11, authorizes the Attorney General to, quote, enter into a cooperative agreement with any state, territory, or political subdivision for detention services. As the Ninth Circuit observed in its California opinion, these provisions direct federal activities, not those of state or local governments. They direct or authorize the federal government to do certain things. They do not withdraw or limit state authority. If anything, they respect the 10th Amendment rule that states cannot be forced to assist with federal programs. They do that by using words like purchase and lease and by referring to cooperative agreements. Now, plaintiffs concede that these statutes do not expressly preempt state law. Instead, they try to recharacterize their claims as field preemption and obstacle preemption claims, but neither framework fits. These statutory provisions do not occupy any field, or at least none relevant here, and Illinois' decision not to enter into cooperative agreements with the federal government can't be understood as an obstacle to the operation of statutes that expressly require the federal government to obtain state consent. And that's exactly what the Ninth Circuit held in the California opinion, that a state's constitutionally protected decision not to assist the federal government cannot be understood as an obstacle to the operation of a federal statute. So, as I said, all the court really needs to do is to read the statutes, which do not preempt Section 15G, but instead respect state's 10th Amendment prerogatives. And if it does, there's no need to consider the question plaintiffs spend the bulk of their brief on, which is the application of the Supreme Court's Murphy decision to this case. Now, I'm happy to talk about Murphy if it's of interest to the court, but if not, I'll move on to the immunity claim. I'm mildly interested, at least, in the interplay between the Murphy language about private entities and the Lawrence County and the Nixon decisions on Missouri telecommunications. Right. All right. So plaintiff's primary argument – I mean, just to back up, I know the court is familiar with this, but Murphy says essentially, as observed Judge Hamilton, that to have preemptive effect, a federal statute has to regulate private entities. And when it does so, it sort of supersedes any state law that regulates those same private entities in a different way. Plaintiffs say that Murphy kind of isn't right because of this 1985 case called Lawrence County. But Lawrence County is unlike both Murphy and this case because it involves spending clause legislation. And everyone agrees that Congress can attach conditions on the receipt of federal funds that it could not impose directly. But that's not the case here. Congress hasn't offered Illinois federal funding that is contingent on making its detention facilities available to the federal government. And again, we know that by looking at the text of the statute, which do no more than to authorize the federal government to contract with the state. So that, I think, resolves plaintiff's kind of primary argument about Murphy and Lawrence County. Now, Judge Hamilton, you also referenced Nixon. Nixon is a case that, you know, I think speaks to the statutory interpretation here. We think the statute is very – these statutes are very clear. They don't preempt state law. They don't have anything to do with the states. They simply direct the federal government to do certain things. But even if there were some ambiguity about that, Nixon teaches that the federalism plain statement rule discussed in Gregory v. Ashcroft and applied in Nixon would require the court to give the statute our reading. And that's because on plaintiff's reading of the statute, it does exactly what the Supreme Court discussed in Nixon. It sort of interposes the federal government in between the state and its subdivisions in contravention of the rule that the state has authority to regulate its subdivisions. And so for that reason, you know, Nixon is sort of the template for this case. Even if the court were to find that the statutes here were ambiguous, it would be required to read them not to have the effect that plaintiffs say that they do. So Ms. Dixon talked mostly about the immunity claim, and I'm happy to turn to that. You know, the immunity claim in our view can be rejected for essentially the same reason as the obstacle preemption claim, which is that the 10th Amendment essentially overrides the immunity doctrine when an immunity claim challenges the state's own decision not to assist the federal government. If it were any other way, the immunity doctrine would essentially swallow the 10th Amendment because it would be impossible for a state to decline to help the federal government without discriminating against it. That's exactly what the Ninth Circuit held in the California case, and plaintiffs say no contrary authority or offer any real response. Now, plaintiffs make a number of additional arguments about the immunity claim, but they all presume that Section 15G is doing something other than implementing the state's own decision not to assist a federal program. But that's all Section 15G does, and so it does not violate the immunity doctrine. Now, you know, you discussed with Ms. Dixon this question of kind of, you know, whether there's a state law principle here that would require a different result, and I just want to emphasize this case has never been about state law in part for the reason that Judge Hamilton gave, which is that a federal court doesn't have the power to award injunctive relief on the basis of a violation of state law. So plaintiffs have never made a state law claim. They have never advanced a state law argument until, I suppose, the last few pages of their reply brief here. You know, reading those pages, I think the argument is essentially that, you know, generally Illinois has the authority, the General Assembly has the authority to do something like this to prohibit counties from, you know, engaging in certain kind of contractual agreements, but it can't do it here because, I gather, because the statute is preempted. But that just sort of loops back, I think, to the preemption argument and fails for the same reasons. So, you know, in our view, the immunity claim is really quite straightforward. This is a state decision about the state's own resources, and because of that, it is not, it simply isn't susceptible to an intergovernmental immunity argument. Mr. Hammer, if Illinois enacted the statute that prohibited private entities from building or leasing detention space to the federal government, do you think Illinois has the power to do that? Well, I mean, you know, so I have to answer first. Of course, the court doesn't need to get into any of that because Illinois has not done that. This case isn't geogroup. It involves Illinois' own decision, not the regulation of third parties. But, you know, certainly I think we would defend the constitutionality of a statute like that because as the kind of back and forth in geogroup illustrates, you know, I think there would be a good faith basis to do so. You know, as to preemption, I think many of the arguments we've made here would also apply to a law regulating private parties. I mean, there would be no Tenth Amendment principle at stake, but the fact would remain that these statutes do not have preemptive effect, either under Murphy or just kind of a plain text reading. And that would be true whether the plaintiffs were private parties or subdivisions of the state. It might not have a preemptive effect, but you'd have an intergovernmental immunity argument that you're targeting a specific form of contracting that would only apply to the federal government. Well, yeah, I agree that the immunity question would be more complicated. You know, plaintiff's primary immunity argument, I heard Ms. Dixon say, is that, you know, this is a direct regulation of the federal government. Now, that's not correct. I mean, the North Dakota case, which we cite and discuss extensively in the brief, you know, kind of rejects that argument on its face. It says a regulation of a federal contractor is not the same as a direct regulation of the federal government. Otherwise, states would lose their authority altogether to regulate businesses that contract with the federal government. So I think the question is, you know, you adverted to, Judge Hamilton, is whether a law like that would discriminate against the federal government. You know, I think this is a really complex area. If you read the kind of geo-group opinion carefully, they resolve that case on this very kind of that specific ground, which is that the law there prohibited private entities from contracting with the federal government, but allowed those entities to continue to provide detention services to the state. So there was a really clear example of, you know, discrimination between the federal government and the state. I can't speak to how, you know, a hypothetical statute would kind of fare under that analysis, but I do think it would depend on, you know, on what the statute says. So I'm happy to address any other issues, any other questions that the court has. If not, we'll rest on the brief and ask that the court affirm the decision below. Thank you, Counsel. Ms. Dixon, rebuttal. Thank you, Your Honors. I would just like to make one brief point, two brief points, excuse me. As to the Murphy decision and the Lawrence County case, it seems easy to just dispose of the Lawrence County case saying, oh, that's just under the spending clause. However, in the Tweed New Haven Airport case versus Connecticut, a case based on preemption not involving the spending clause, the Second Circuit didn't adopt the Murphy language saying that private actors were required. There were no private actors in that case. And when the Second Circuit affirmed the preemption argument,  and the Supreme Court denied that cert petition after the Murphy decision. So the Supreme Court allowed, you know, that preemption case to stand, even though no private actors were involved. And even though there was not, it wasn't a spending clause issue. So there are cases in the Supreme Court sort of hanging out there that don't require the private actor language in Murphy. And again, in Murphy and the case which it cites, New York versus United States, the case it cites for the private actor language, those are both an imposition of a regulatory scheme on a state. This is not an imposition of a regulatory scheme on the state. And then finally, the intergovernmental immunity argument. It doesn't matter that we're not private actors in that scenario. The only way the state can win on that is if you accept the Tenth Amendment argument that the two are one because this is a regulation of the federal government and only the federal government in an activity that they exclusively do. Do you see any connection, Ms. Dixon, between Commerce Clause Doctrine, which distinguishes between states as regulators and states as market participants? The state is allowed to do all kinds of things as a market participant that it can't do as a regulator. I just don't have a familiarity enough with that to give an educated opinion. It would not be productive then. All right. Thank you. Thank you very much. Our thanks to all counsel. The case is taken under advisement.